UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | |
|---|---|
| BRIAN SCOTT MARTIN, ) | |
| ) | Criminal Action No. 6: 04-79-DCR |
| Petitioner/Defendant, ) | (Civil Action No. 6: 06-289-DCR) |
| ) | |
| V. ) | |
| ) | |
| UNITED STATES OF AMERICA, ) | **MEMORANDUM OPINION** |
| ) | **AND ORDER** |
| Respondent/Plaintiff. ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Petitioner/Defendant Brian Scott Martin (hereafter, "Petitioner" or "Martin") was arrested in connection with a criminal complaint filed by Richard Dalrymple, a Task Force Officer with the Drug Enforcement Administration, in October 2004. [Record No. 1]  Martin was subsequently indicted by a federal grand jury on October 28, 2004. [Record No. 16]  Following the filing of a twelve count superseding indictment, Martin moved the Court to be rearraigned. [Record Nos. 12, 59]  His motion was granted and a rearraignment hearing was held on February 8, 2005.

During the February 8, 2005, hearing, the Court determined that Martin was competent to proceed and that he fully understood the charges against him.  During the rearraignment hearing, Martin tendered a Plea Agreement and orally acknowledged his involvement in the counts of his conviction. [Record Nos. 96, 116]  Thereafter, a sentencing hearing was held on June 13, 2005.  At the conclusion of the sentencing hearing, Martin was sentenced to 151 months' imprisonment.  The Judgment and Commitment Order was entered the following day,

June 14, 2005. [Record No. 97] Martin did not file a direct appeal following entry of the Judgment.

However, on July 3, 2006, Martin filed a form Motion to Vacate, Set Aside, or Correct Sentence. [Record No. 99] Because his claims were vague, the United States sought and obtained an Order directing Martin to submit a more complete statement of the claims supporting the requested relief. Thereafter, on November 6, 2006, Martin filed a supplemental petition. [Record No. 106] The United States responded to the Martin's initial and supplemental petition by moving the Court to dismiss his request for collateral relief the based on Martin's failure to request such relief within one year of the judgment becoming final. [Record No. 110] Although Martin was given additional time to respond to the United States' motion, he has not filed a response within the time permitted. Accordingly, the Court will proceed to review the motion to dismiss.

Having considered this matter, the Court finds that Martin has not filed his request for collateral relief within the one-year period permitted by the Antiterrorism and Effective Death Penalty Act of 1996. Further, no reasons have been provided which would allow the Court to equitably toll the one year period.

Although resolution of the statute of limitations issue effectively forecloses Martin's claims, the Court has also reviewed the merits of his claim and concludes that they do not entitle the Petitioner to the relief sought. Accordingly, the United States' motion will be granted and this action will be dismissed, with prejudice.

    **A.**    **Relevant Facts**

<u>The Criminal Complaint [Record No. 1]</u>

In late 2003 or early 2004, Lieutenant David Neal of the Pike County, Georgia Sheriff's Office commenced an investigation into illegal methamphetamine trafficking activities of George Fordham and several of his associates, including Martin. Through information obtained from a confidential informant, Lieutenant Neal discovered that the organization was distributing between one and one and one-half pounds of methamphetamine two to three times per week in the Eastern District of Kentucky. During September 2004, detectives and officers with the Laurel County, Kentucky Sheriff's Department arranged controlled purchases of methamphetamine from Tony Baker. Following execution of a search warrant, Baker identified Fordham and Trae Whitis as the source of the methamphetamine found at his residence. In an attempt to cooperate with law enforcement, Baker agreed to make recorded telephone calls to Whitis for the purpose of arranging additional drug purchases.

On September 29, 2004, Whitis was detained during an additional illegal drug transaction in Laurel County, Kentucky. During questioning, Whitis identified Fordham as the source of his methamphetamine. Whitis further stated that Fordham was accompanied by Martin at the time of the illegal deliveries. Whitis also agreed to cooperate with authorities by placing a call to Fordham to obtain additional methamphetamine.

Following a call from Whitis, Fordham and Martin were stopped by law enforcement officers near Whitis' apartment in Laurel County. After being advised of his rights, Martin was interviewed by Laurel County Deputy Sheriff Buddy Blair. During this interview, Martin stated that he was afraid of Fordham but further acknowledged that he and Fordham were in the

London, Kentucky area to deliver methamphetamine. In addition, he acknowledged previous deliveries of the controlled substance in the area. Further, Martin stated that additional methamphetamine was located in their hotel room.

Martin was again interviewed in the early morning hours of September 29, 2004, after being transported to the Laurel County Sheriff's office. During this interview, Martin stated that he was approached by Fordham in August 2004, about accompanying Fordham to Kentucky to deliver methamphetamine. Martin stated that on the first trip, the pair brought one-half pound of methamphetamine for distribution. He also acknowledged making one to two trips to Kentucky per week, bringing one-half to one pound per trip. Martin was also able to provide specific details regarding Fordham's source of methamphetamine, cost and profit margin, and customer base in Kentucky. Martin stated that he was paid in methamphetamine and small amounts of cash for his involvement.

Based on the information outlined above, a federal Criminal Complaint was filed October 15, 2004, with the arrest warrant for Martin being returned on that date. Martin initially appeared before United States Magistrate Judge J. B. Johnson, Jr. Magistrate Judge Johnson initially appointed CJA panel attorney Jennifer Nicholson as counsel for Martin. [Record Nos. 1-3]

### The October 28, 2004, Indictment [Record No. 16]

A federal grand jury sitting in London, Kentucky, returned a one count indictment against Martin on October 28, 2004. The indictment charged that, on or about January 2003, and continuing through on or about September 28, 2004, in Laurel County, in the Eastern District

of Kentucky, Martin conspired with others to knowingly and intentionally distribute and possess with intent to distribute five kilograms or more of a mixture or substance containing a detectible amount of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846.  [Record No. 16]  Martin was arraigned on this charge on November 4, 2004, and entered a not guilty plea.  Less than one month later, Ms. Nicholson moved the Court for permission to withdraw as Martin's counsel.  In support, Nicholson represented that a conflict of interest had developed which prevent her from continuing to represent Martin. [Record No. 23] The motion to withdraw was granted on December 2, 2004, and another panel attorney, Bruce Bentley, was appointed to represent the Petitioner. [Record No. 24][1]

A pretrial conference was held December 14, 2004. During this conference, Martin's second attorney, Bruce Bentley requested and was granted permission to withdraw from the case. A third CJA panel attorney, Douglas Benge, was then appointed to represent the Petitioner. [Record No. 27]

### The Superseding Indictment [Record No. 28]

Trial on the original indictment was initially scheduled to begin January 4, 2005. However, on December 16, 2004, the grand jury returned a twelve-count superseding indictment against Martin, Tony Baker and Trae Whitis. [Record No. 28][2]   In Count 1, the grand jury

---

[1]  During the December 2, 2004, hearing, the Court made provisions for Martin to begin receiving 30 day inpatient drug treatment at a nearby facility.

[2]  Because Fordham committed suicide while he was detained by the Laurel County Sheriff's Department, he was not named in the superseding indictment.

charged that Martin, Baker and Whitis conspired together and with others to possess with intent to distribute five kilograms or more of a mixture or substance containing a detectible amount of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846. Martin was charged in Count 2 with money laundering in connection with the drug trafficking activities in violation of 18 U.S.C. §§ 1956 and 1957. Count 3 charged Martin with interstate travel for the purpose of carrying on the distribution and possession with intent to distribute methamphetamine in violation of 18 U.S.C. § 1952. The co-Defendants were charged in Counts 4 through 8 with various possession and distribution charges as well as a firearm charge. Finally, Martin was charged in Count 9 with possessing with intent to distribute methamphetamine on September 28, 2004, in violation of 21 U.S.C. 841(a)(1).[3]

The Defendants were arraigned on the charges contained in the superseding indictment on January 6, 2005. [Record Nos. 36-38] At that time, trial was rescheduled to begin February 15, 2005, with a pretrial conference set for February 7, 2005.[4] However, prior to the pretrial conference, all Defendants moved the Court to be rearraigned for the purpose of entry of guilty pleas in accordance with written Plea Agreements.

### Martin's Rearraignment Hearing

On February 8, 2005, Martin moved the Court to be rearraigned for the purpose of entering a guilty plea to Counts 1, 2 and 12 of the superseding indictment. [Record No. 59] During the rearraignment hearing, Martin was questioned and found to be competent to proceed.

---

[3] Counts 10-12 sought forfeiture of various sums of cash from the Defendants.

[4] The pretrial conference was continued until February 8, 2005, by subsequent Order. [Record No. 45]

He acknowledged that he had discussed the relevant charges with his attorney and that he understood those charges. And when asked whether he was satisfied with the advice and counsel that his attorney Douglas Benge had provided to him, Martin responded, "Yes, sir." [Record No. 116, p. 17]

Martin also acknowledged that he had discuss the impact of recent Supreme Court decisions with his attorney and that he had conducted independent internet research regarding the issue. [*Id.*] In addition, he indicated that he had reviewed his Plea Agreement with his attorney and that understood its terms. [*Id.* at p. 20] Counsel for the United States and the Court then proceeded to review relevant provisions of each Defendant's Plea Agreement, including the waiver provisions.

The discussion concerning Martin's Plea Agreement appears at pages 26 through 28 and 34 through 43 of the transcript of the hearing held February 8, 2005. [Record No. 116] Specifically, the Court explained, *inter alia,* the maximum statutory penalties for the counts of conviction, the mandatory minimum term applicable to Count 1 as well as the statutory penalties applicable to the remaining counts, the possibility of a departure under Section 5K1.1 of the United States Sentencing Guidelines, and application of the waiver language contained in the Plea Agreement.

After reviewing the rights that Martin would be forfeiting by entering a guilty plea, the Court them reviewed Counts 1, 2, and 12 with him. Martin was then asked to explain his actions in connection with these charges. He responded as follows:

> DEFENDANT MARTIN: For the record, from September until December is the only time I traveled with him until the last couple of times when I met Trae and

them. I rode with my brother-in-law [Fordham] where he sold methamphetamine and other dealings with, you know, people around here. And the last trip, you know, I was with him, we left the money and methamphetamine in a motel room which was in my name and I just feel I'm guilty of knowing and not telling. You know, I gained nothing by the proceeds from any of this.

THE COURT: All right. Now, I want to ask you about the facts that are alleged or set forth in paragraph three of your plea agreement. Do you agree that those facts are true and correct?

DEFENDANT MARTIN: Yeah, I agree.

THE COURT: Do you agree? In other words, if the United States were to proceed to trial in this matter, do you believe that they could prove those facts that are set forth in that paragraph?

DEFENDANT MARTIN: Yes, sir.

THE COURT: All right. Do you also agree with – I know that there's several amounts of methamphetamine that are set forth in that paragraph. Do you agree with those quantities that are set forth?

DEFENDANT MARTIN: Yes, sir.

[Record No. 116, pp. 53-54]

### Martin's Plea Agreement

Additional facts relating to Martin's guilty plea are set forth in paragraph 3 of his Plea Agreement. As noted above, Martin acknowledged that the facts contained in paragraph 3 were true and correct. This paragraph provides,

> (a) That on or about September 22, 2004, in Laurel County in the Eastern District of Kentucky, agents and a cooperating witness (CW) from the Laurel County Sheriff's Department went to the residence of Tony Baker located on Somerset Road in Laurel County, Kentucky. The CW purchased approximately .96 grams of a methamphetamine mixture that tested positive for .65 percent pure methamphetamine. Baker was armed with a pistol at the time of the transaction.

(b) On or about September 28, 2004, a second purchase of methamphetamine mixture was purchased from Tony Baker at the same location. It tested positive for 1.4 grams of a methamphetamine mixture with a 1.1 grams of pure methamphetamine. A state search warrant was executed on the same date at Baker's residence locating 3.8 grams of a methamphetamine mixture and testing positive for 3.3 grams of pure methamphetamine. Several firearms, marked "buy" money, and $2,124 dollars in United States currency were recovered. Baker provided a full statement indicating his source of supply was Trae Whitis and another individual. Baker agreed to make a phone call to Whitis and arrange a delivery of methamphetamine.

(c) Whitis arrived at the meet location with approximately 4 ounces of methamphetamine that tested positive for 66.1 grams of pure methamphetamine. He was also in possession of $2,750 in United States currency. Whitis admitted his involvement and stated that he had received his methamphetamine from Scott Martin and another individual from Georgia. Whitis agreed to cooperate and placed a phone call to Scott Martin and the other individual.

(d) Martin and the other individual arrived at the second "meet" location and were arrested at that time. Martin was interviewed and stated that there was another quantity of methamphetamine in his hotel room. He gave consent to search that location. Approximately 2 ounces that tested positive for 33.9 grams of pure methamphetamine was discovered as well as $2,452 in United States currency.

(e) Martin stated that he and the other individual had been making trips from Georgia to Kentucky bringing methamphetamine. Martin stated they would bring between a half pound to a pound on every trip. Martin stated that the other individual would make between $10,000 to $15,000 per trip. Martin advised that the trips started in August 2003 and continued through December 2003. Martin further advised that the trips continued after Fordham was released from jail in Georgia approximately two months prior to the interview date of September 29, 2004.

[Record No. 96]

The Plea Agreement also contained recommendations concerning calculations under the United States Sentencing Guidelines. The parties recommended a base offense level of 36, based on the relevant drug quantity admitted by Martin. In addition, the parties recommended a two level increase under U.S.S.G. §2S1.1(b)(2)(B), and a three level reduction based on timely

acceptance of responsibility. Further, the parties indicated that the Petitioner may qualify for an additional two level reduction under the safety valve provision of the sentencing guidelines, §5C1.2.

In paragraph seven, the Petitioner waived "the right to appeal and the right to attack collaterally the guilty plea, conviction, and any lawful sentence. And in paragraph eight, the parties agreed that, if the Petitioner provided assistance in the investigation or prosecution of others, the United States would consider filing a motion for departure under U.S.S.G. §5K1.1 and/or 18 U.S.C. § 3553(e). [Record No. 96]

### The Sentencing Hearing [Record No. 108]

Martin's sentencing hearing was held June 13, 2005. Prior to this hearing, Martin retained new counsel. Accordingly, on May 3, 2005, his third court-appointed counsel was relieved of any further responsibility in the matter. [Record Nos. 74-76] At the outset of this hearing, the Court confirmed that Martin had received a copy of his presentence report, that he had reviewed the report with his attorney, and that there were no objections to the report. [Record No. 108, pp. 3, 7]

Before reviewing the relevant guideline calculations contained in the presentence report, counsel advised the Court that Martin had not yet had the opportunity to cooperate in an attempt to earn a departure motion under U.S.S.G. §5K1.1. Accordingly, the parties jointly requested that Martin's self-surrender date be extended. [Record No. 108, pp. 4-5] After hearing from counsel, the following discussion ensued.

> THE COURT: What I am inclined to do, and of course I can't consider the 5K motion at this time, as the motion has not been made. Any motions under Rule

> 35, I have to take that up at the time. I can't consider any possible cooperation, as you know.
>
> I would be inclined to delay the report date, the self-report date for 120 days, providing that that's going to give everyone sufficient time to do what needs to be done. Mr. West, do you think that it will?
>
> MR. WEST: It will, your Honor. I spoke to the agent about that time period also. If Mr. Martin is engaged in something active prior to the self-surrender date, we may petition the Court to ask for a few more days for the self-surrender date. And the agent is in agreement with that, also.
>
> MR. ZEVELY: That's very fair.
>
> THE COURT: You can bring that up at the time. And as you know, I will give you some latitude.

[Record No. 108, pp. 5-6]

The guideline calculations contained in the presentence report and applied by the Court were identical to those recommended by the parties and contained in the Plea Agreement. With a Total Offense Level of 33 and Criminal History Category I, Martin's guideline range was 135 to 168 months' imprisonment. His fine range was calculated as being $17,500 to $5,008,000. However, the Court also considered all factors contained in 18 U.S.C. § 3553(a) in determining the sentence imposed in the case.

After considering all relevant factors and hearing from counsel and Martin, the Court imposed a sentence of imprisonment of 151 months.[5] The Court did not impose a fine, based on its finding that the Petitioner lacked the ability to pay a fine without imposing an undue hardship

---

[5] During elocution, Martin expressed regret for his actions and stated that he understood he would have to pay for wrongful conduct. He requested that the Court impose a sentence that was fair and indicated that he would hope for the best. [Record No. 108, p. 11]

on his family. Further, with respect to Martin's drug addiction, the Court made the following observations:

> THE COURT: As you know, I was concerned about Mr. Martin, his drug habit, at the time he appeared before. And he's one of the folks that I believe has really taken advantage of that treatment that he received. So I'm glad that part, hopefully that is behind you now, of course.

[Record No. 108, p. 12]

Although Martin had successfully completed a drug treatment program prior to sentencing, the Court recommended the 500 hour intensive drug education and treatment program offered by the Bureau of Prisons. The Court explained that, although Martin had already completed the shorter program, he could benefit from the longer program. [Record No. 108, p. 13-14] Finally, the Court recommended that Martin serve his sentence at a location close to his home. Neither party objected to the sentence imposed or to any of the proceedings. [Record No. 108, p. 16]

The Judgment and Commitment Order was entered June 14, 2005. [Record No. 97] Martin did not file a direct appeal from the guilty plea, conviction or sentence.

### B. The Petitioner's Claims

#### Martin's Original Motion for Habeas Relief

The form motion filed July 3, 2006, contains very little information supporting Martin's petition. As grounds for the relief requested, Martin states on page 5 of the document that "if not for ineffective assistance of counsel thru action and omission of action, petitioner would not have entered in plea agreement, nor plead guilty." Also, in attempting to explain his failure to file a direct appeal, Martin indicates that a "waiver [was] included as part of plea agreement not to appeal directly or collaterally challenge conviction." [Record No. 99, p. 5]

Martin further alleges that he did not proceed to trial as a result of being "misled by counsel." He also asserts that his plea agreement is void due to the fact that it was entered into as a result of coercion by his attorney as well as the attorney for the United States. [Record No. 99, pp. 6, 8] Finally, at page 13 of the form document, Martin asserts that his motion is timely; however, he does not provide any details regarding the date of his filing.

<u>Martin's Supplemental Pleading [Record No. 106]</u>

The Petitioner's supplemental pleading contains additional information and details concerning his claims. Martin explains that, on September 28, 2004, he and George Fordham were stopped by authorities. After searching their vehicle, Fordham and Martin gave permission for a search of their hotel room. During this search, officers found money, scales and a quantity of methamphetamine. Both suspects were then taken to the Laurel County Detention Center. While in custody, Fordham was discovered to have committed suicide in a restroom. Martin claims that he was shown the bloody bathroom area. He was then taken to another area for questioning where he observed one officer with drops of blood on his shirt.

During questioning, Martin claims to have advised the officers that he had recently consumed methamphetamine. He also states that he eventually told them what they wanted to know because he was frightened. According to Martin, he believed that the officers had killed Fordham. Martin asserts that he denied direct involvement in Fordham's drug trafficking activities. Instead, he claims that he was just along for the ride in order to "get high." [Record No. 106, pp. 1-3]

Martin claims that his first court-appointed counsel advised him that he was "in a lot of trouble" and complained that the undersigned judge (who she referred to as "Darth Vader") did not give anyone a break. According to Martin, Ms. Nicholson "drug him along for two months" and then asked to be removed from the case due to a conflict of interest. Martin also claims that Ms. Nicholson falsely represented that he would eventually receive one year off his sentence for Court-ordered drug rehabilitation.[6]

Martin also complains that his second court-appointed attorney, Bruce Bentley, rendered ineffective assistance by failing to come to see him or return his calls. With respect to Mr. Benge, Martin asserts that, after returning from Georgia following completion of his drug rehabilitation program, his attorney advised that the co-Defendants had changed their stories and, as a result, were alleging that Martin was responsible for bringing all the drugs to Kentucky. Martin states that his attorney advised him that he was facing fifty years imprisonment if he did not enter into a plea agreement with the government.

Martin claims that Mr. Benge sent him to meet with the federal agents assigned to the case alone. He further contends that, after returning to Georgia, he attempted to contact Mr. Benge, but Mr. Benge did not return his calls. After returning to Kentucky, Martin states that he was shown a plea agreement which was quickly reviewed with his counsel. Martin asserts that he unsuccessfully attempted to have his case transferred to Georgia. However, when this effort was unsuccessful, he states that he agreed to enter a guilty plea because he was afraid of

---

[6]   As noted above, the Court recommended at sentencing that Martin participate in the Bureau of Prison's 500 intensive drug education and treatment program. Successful completion of this program will result in a reduction of the Petitioner's overall sentence. Therefore, it does not appear that this particular representation by Ms. Nicholson (if actually made) was false.

receiving a lengthy sentence and because he remained fearful of Kentucky law enforcement who he believed may have killed Fordham.

### C. The United States' Motion to Dismiss

On December 14, 2006, the United States moved the Court to dismiss Martin's petition because the petition was not filed within the one year filing limitation provided by 28 U.S.C. § 2255. [Record No. 110] According to the government, because Martin did not file a direct appeal, his conviction became final on or about June 28, 2005 (ten days after the Judgement was entered). Therefore, under *United States v. Cottage*, 307 F.3d 494, 498 (6th Cir. 2002), *United States v. Marcello*, 212 F.3d 1005, 1010 (7th Cir. 2000), *Nichols v. United States*, 285 F.3d 445, 446 (6th Cir. 2002), and *Hyatt v. United States*, 207 F.3d 831 (6th Cir. 2000), dismissal is required.

The Petitioner initially was given until January 4, 2007, to respond to the United States' motion. On January 8, 2007, the time for filing a response was extended until February 5, 2007. However, as of this date, Martin has not responded to the government's motion.

### D. The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")

The AEDPA provides, in relevant part, that:

> A one-year period of limitation shall apply to a motion under this section. This limitation period shall run from the latest of –
>
> (1) the date on which the judgment of conviction became final;
>
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

-15-

> (3) the date on which the right asserted was initially recognized by the Supreme Court, if the right had been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255.

As noted above, Martin was sentenced on June 13, 2005, with the Judgment and Commitment Order entered the following day. Because he did not file a direct appeal within ten days, his conviction became final on June 28, 2005. *United States v. Cottage*, *supra* at 499 (as a general matter, a conviction becomes final for purposes of collateral attack at the conclusion of direct review). Martin's habeas petition was not filed until July 3, 2006, or more than one year after his conviction became final. Further, he has not attempted to explain his failure to file the petition prior to the expiration of the one year limitations period. Thus, his petition was not timely filed.

Notwithstanding his failure to timely file his request for collateral relief, the Court has also examined the underlying claims and finds them to be without merit. First, Martin waived the right to attack collaterally the guilty plea, conviction and sentence. At the time of his rearraignment, Martin acknowledged that he understood the full import of the waiver provision contained in his Plea Agreement. Such waivers are valid and foreclose the relief sought herein.

During the February 8, 2005, hearing, the Court reviewed each of the waiver provisions contained in the Defendants' Plea Agreement. Defendant Whitis' plea agreement was similar to Martin's with regard to his waiver of the right to appeal or collaterally attack his guilty plea,

conviction or sentence. After reviewing Whitis' waiver provision in Martin's presence, the Court proceeded to review the waiver provision contained in Martin's Plea Agreement.

> THE COURT: Mr. Whitis, let me ask you some of those same questions. I believe your plea agreement has that same waiver. It has waiver language contained in paragraph seven. It's not unusual to have this language in a plea agreement, and it does provide that you waive the right to appeal, the right to collaterally attack – and the right to collaterally attack the guilty plea, conviction and any lawful sentence. Do you understand those rights?
>
> ** ** **
>
> THE COURT: All right. And, Mr. Martin, you plea agreement contains the same type of waiver language. You understand that you are waiving or giving up the right to challenge on appeal or collaterally attack the guilty plea, the conviction, and any lawful sentence that would be imposed? You understand that?
>
> MR. MARTIN: Yes, sir.

[Record No. 116, pp. 42-43] Similar waiver provisions are routinely upheld in this circuit. *See United States v. Wilson*, 438 F.3d 672, 673-74 (6th Cir. 2006) ("It is well-established that any right, even a constitutional right, may be surrendered in a plea agreement if that waiver was made knowingly and voluntarily.") *See also United States v. Calderon*, 388 F.3d 197, 199, 200 (6th Cir. 2004) (waiver is made knowingly and voluntarily when the defendant testifies at the plea hearing that he has reviewed and understood the plea agreement's provisions and that his guilty plea was not coerced). Here, it is clear that Martin's waiver was voluntary and made with full knowledge of its effect.

Next, Martin fully and completely acknowledged his guilt to Counts 1 and 2 of the superseding indictment. Again, during rearraignment, Martin acknowledged the truth of the information contained in paragraph 3 of the Plea Agreement and agreed that, if the matter

proceeded to trial, the United States would be able to prove those facts to a jury. While Martin may have been frightened initially by Fordham, during the rearraignment hearing held on February 8, 2005, he acknowledged participating in a drug conspiracy that involved several transactions and shipments to the Eastern District of Kentucky. And despite his claimed fears, Martin has never attempted to explain why he did not withdraw from the conspiracy, despite having had numerous opportunities to do so.

Likewise, Martin's claim of ineffective assistance of counsel would not support the relief sought under the facts presented. The law is well-settled that, to establish a claim of ineffective assistance of counsel, a petitioner must demonstrate that counsel's performance was constitutionally deficient and that the alleged deficiency resulted in prejudice to the petitioner. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). With respect to a claim of prejudice in connection with a plea agreement, the petitioner must demonstrate a "reasonable probability that, but for counsel's errors [the petitioner] wound not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart,* 474 U.S. 52, 59 (1985); *Walker v. United States*, *supra* at 691.

In the present case, although Martin now complains about each and every attorney that has represented him in this action, he did not make such complaints before the Court when given the opportunity to do so. Instead, Martin indicated that he was satisfied with the representation he received prior to entry of his guilty plea. And while Martin claims that his original attorney gave him the impression that he would be unfairly treated, he admits that she represented him

for only a limited time. Further, he does not claim that the attorneys subsequently appointed by the Court made disparaging remarks similar to those allegedly made by Ms. Nicholson.

Likewise, while Martin claims that his attorney lied about the credit he would receive by successfully completing a drug treatment program, it is apparent that this alleged statement would not have been incorrect in any event. By successfully completing the Bureau of Prison's 500 hour intensive drug treatment program, the Petitioner will be able to reduce his sentence by nearly one year.

In addition to lacking merit, the waiver provision contained in his Plea Agreement and discussed above effectively prevents Martin from raising claims of ineffective assistance of counsel. *Davila v. United States*, 258 F.3d 448, 450-53 (6th Cir. 2001) (when a defendant knowingly, voluntarily and intelligently waives the right to collaterally attack his sentence he or she effectively foreclosed his right to bring a § 2255 petition based on the claim of ineffective assistance of counsel). And as this Court has already concluded, Martin's waiver was knowingly, voluntarily and intelligently made. Therefore, the Court finds his claims of ineffective assistance to be barred by paragraph 7 of his Plea Agreement.

### E. Conclusion

Petitioner Martin did not instituted this habeas proceeding within one year of the date his conviction became final. Therefore, his claims are barred by 28 U.S.C. § 2255. Additionally, even if these claims were not barred by the applicable statute of limitations, they would be dismissed as being without merit. Accordingly, it is hereby

**ORDERED** that Petitioner Brian Scott Martin's Motion to Vacate, Set Aside, or Correct his Sentence [Record No. 99] is **DENIED**.  The United States' Motion to Dismiss the Petitioner's Motion to Vacate, Set Aside, or Correct his Sentence [Record No. 110] is **GRANTED**.  Petitioner Brian Martin's motion filed pursuant to 28 U.S.C. § 2255 [Record No. 99] is **DISMISSED**, with prejudice.  A certificate of appealability shall not issue because the Petitioner has not made a substantial showing of the denial of any substantive constitutional right.  A separate Judgment consistent with this Memorandum Opinion and Order shall be entered this date.

This 20th day of February, 2007.



Signed By:
*Danny C. Reeves*   DCR
United States District Judge